UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

FILED

2004 JUL 14 P 4:40

| | | |
|---|---|---|
| WILLIAM SCOTT | : | CASE NO. 303CV632(SRU) |
|     Plaintiff | : | |
| VS. | : | |
| | : | |
| UNITED NATURAL FOODS, INC. | : | JULY 9, 2004 |
|     Defendant | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

The Plaintiff, William Scott (Scott), has requested, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, that this honorable Court order the Defendant, United Natural Foods, Inc. (UNF) to produce the complete personnel files of Mr. Ronald Gagnon (Gagnon) and Mr. Jessie Knight (Knight). For the reasons set forth below, Scott's motion should be granted.

### BACKGROUND

The gravamen of Scott's complaint is that UNF allowed a hostile work environment to spiral out of control when it failed to take any remedial action against one of its supervisors, Gagnon, a white dispatcher, who repeatedly engaged in the racial harassment and disparate treatment of Scott, an African-American truck driver. UNF's failure to properly address Scott's complaints of racial harassment and discrimination amounted to UNF's constructive discharge of Scott on March 7, 2001. Shortly thereafter, in June 2001, for unknown reasons unknown to Plaintiff, UNF dismissed Gagnon.

- 1 -

In December 1999, Scott began working as a truck driver at UNF. In early August 2000, Gagnon, a fellow truck driver who later became Scott's supervisor, called Scott a racial epithet. Scott was humiliated, but he did not report the incident to UNF at that time because he did not want to cause problems.

In late August 2000, Gagnon again called Scott a racial epithet, this time in front of a large group of co-workers.

In September 2000, Scott complained to Blair Altemus (Altemus) – the Manager of the Dayville, Connecticut facility where both Scott and Gagnon worked – about Gagnon's comments. Altemus promised Scott UNF would conduct an investigation and take the appropriate course of action. However, UNF never disciplined Gagnon for the racial slurs he hurled at Scott. Instead, in November 2000, UNF promoted Gagnon to dispatcher, making him Scott's immediate supervisor.

Over the next several months, Scott suffered unfair treatment at the hands of Gagnon. For example, on information and belief, Gagnon intentionally misplaced a doctor's note that would have allowed Scott an excused absence from work. Also, on several occasions, Gagnon "wrote up" Scott for trivial offenses that he ignored when done by white drivers. Finally, on February 23 2001, Gagnon, citing disciplinary problems, informed Scott he was suspended from his job for two days.

Scott immediately complained to Altemus that Gagnon had been treating him unfairly, but Altemus was inattentive to Scott's complaints. As a result, Scott contacted Ms. Karen Eichstadt (Eichstadt), UNF's Human Resources Manager, and met with her on March 2, 2003 to discuss the situation. Scott

demanded that UNF rectify the hostile work environment, and he refused to return to work with Gagnon as his supervisor.

UNF promised Scott a meeting between Scott, Gagnon, himself, and Eichstadt would be arranged in order to rectify the situation. However, a meeting was never scheduled. Therefore, Scott did not return to work.

Shortly thereafter, on March 7, 2001, UNF terminated Scott from his job for having two consecutive absences, claiming that he abandoned his job.

On April 8, 2003, Scott filed a complaint in this Court alleging racial discrimination and disparate treatment in violation of Title VII of the Civil Rights Act of 1964.

On April 28, 2004, for the purpose of discovery, Scott sought to depose Eichstadt. Scott requested the production of several personnel files[1] including those of: (1) Scott; (2) Gagnon, the accused harasser and Scott's supervisor; and (3) Knight, the only African-American trucker driver, other than Scott, employed by UNF at the Dayville, Connecticut facility during the time of Scott's employment (Scott's Discovery Request).

---

1 Section 31-128a(3) of the Connecticut General Statutes states:

> "Personnel file" means papers, documents and reports, including electronic mail and facsimiles, pertaining to a particular employee that are used or have been used by an employer to determine such employee's eligibility for employment, promotion, additional compensation, transfer, termination, disciplinary or other adverse personnel action including employee evaluations or reports relating to such employee's character, credit and work habits. "Personnel file" does not mean stock option or management bonus plan records, medical records, letters of reference or recommendations from third parties including former employers, materials that are used by the employer to plan for future operations, information contained in separately maintained security files, test information, the disclosure of which would invalidate the test, or documents which are being developed or prepared for use in civil, criminal or grievance procedures. Conn. Gen. Stat. § 31-128(a)(3) (2003).

UNF did not fully comply with Scott's Discovery Request. On or about May 18, 2004, UNF produced Scott's entire personnel file. However, UNF only produced a portion of Gagnon's file, for the period covering Scott's employment, omitting Gagnon's final three months of employment. Furthermore, UNF has failed to produce <u>any</u> portion of Knight's personnel file.

## ARGUMENT

### I. STANDARD OF LAW

Rule 26(b)(1) of the Federal Rules of Civil Procedure states, in pertinent part, that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1). For the purposes of discovery, information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence." Id.; See <u>Daval Steel Prods. v. M/V Fakredine</u>, 951 F.2d 1357, 1367 (2d Cir. 1991). "Courts have broad discretion in determining that which is relevant to the claim or defense of any party." <u>In re Pe Corp. Sec. Litig.</u>, 221 F.R.D. 20, 23 (D. Conn. 2003) (citing <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979)).

Furthermore, "[t]he scope of discovery is especially broad in Title VII cases," <u>Henderson v. Nat'l R.R. Passenger Corp.</u>, 113 F.R.D. 502, 506 (N.D. Ill. 1986), and, therefore, any information that may lead to the discovery of admissible evidence must be produced.

For the following reasons, this Court should order UNF to produce the missing personnel files.

## II. UNF HAS FAILED TO PROPERLY ARTICULATE A REASON FOR WITHHOLDING PRODUCTION OF THE DOCUMENTS

This Court has ruled that a party objecting to a discovery request bears the burden of showing why discovery should be denied. Boutvis v. Risk Mgmt. Alternatives, Inc., No. CIVIL 3:01 CV 1933 (DJS), 2002 U.S. Dist. LEXIS 8521, at *3 (D. Conn. May 3, 2002) (citing Blankenship v. Hearst Corp., 519 F.2d 418 (9th Cir. 1975)); see also Obiajulu v. City of Rochester Dep't of Law, 166 F.R.D. 293, 295 (W.D.N.Y. 1996) (stating that "[t]he burden is on the party resisting discovery to clarify and explain precisely why its objections are proper . . . "). Furthermore, "[t]he mere statement by a party that discovery is 'irrelevant and immaterial' is not enough to discharge this burden." Boutvis, 2002 U.S. Dist. LEXIS at *3 (citing Joseph v. Harris Corp., 677 F.2d 985, 992 (3rd Cir. 1982)).

In this case, UNF has failed to articulate a reasonable objection to producing the personnel files, other than a generic denial on the grounds of irrelevance.

Indeed, UNF has not claimed the discovery request to be overbroad or unduly burdensome, nor has UNF claimed the requested documents to be protected by any privilege or that the request violated a right to privacy. In fact, Scott failed to give any reason for refusing to supply Jessie Knight's file.

## III. THE DISCOVERY REQUEST IS RELEVANT AND SUBJECT TO PRODUCTION

Courts typically will permit discovery in employment discrimination cases to cover a reasonable number of years before and after the alleged discrimination. Equal Employment Opportunity Comm'n v. Autozone, 258 F.Supp.2d 822, 831 (W.D. Tenn. 2003). See, e.g., James v. Newspaper Agency

Corp., 591 F.2d 579, 582 (10th Cir. 1979) (allowing discovery into four-year period prior to alleged discrimination); Raddatz v. Standard Register Co., 177 F.R.D. 446, 448 (D. Minn. 1997) (allowing discovery into two-year period following alleged discriminatory termination).  Some courts have followed a "five year rule," limiting discovery to "five years prior to the date of the alleged discriminatory act."  See, e.g., McClain v. Mack Trucks, Inc., 85 F.R.D. 53, 63 (E.D. Pa. 1979) (limiting discovery to approximately five years prior to alleged violation); Milner v. Nat'l Sch. of Health Tech., 73 F.R.D. 628, 632 (E.D. Pa. 1977) (five years); Cormier v. PPG Indus., Inc., 452 F.Supp. 594, (W.D. La. 1978) (five years).  Other courts have found it reasonable to limit the temporal scope of any post-charge investigation to a two-year period after the alleged discriminatory violation.  Equal Employment Opportunity Comm'n v. Autozone, 258 F.Supp.2d 822, 831 (W.D. Tenn. 2003);  See, e.g., Hicks v. Arthur, 159 F.R.D. 468, 471 (E.D. Pa. 1995) (allowing discovery into two-year period following alleged discriminatory demotion and failure to place in former position when the position became available); Robbins v. Camden City Bd. of Educ., 105 F.R.D. 49, 62-63 (D.N.J. 1985) (allowing discovery for two-year period following termination of employment).

In this case, the requested discovery items relate to a very short period of time – three months – for the period immediately after Scott's dismissal.  Therefore, in line with the overwhelming authority in these courts, UNF's claim of temporal irrelevance should be rejected.  The mere fact that the requested discovery pertains to a period after Scott's employment does not render it irrelevant.

### A.   Gagnon's File

In the present case, UNF has argued that what happened to Gagnon after Scott left the company is irrelevant and, therefore, it is not required to produce the portion of Gagnon's personnel file covering the time period after March 7, 2001, Scott's last day of employment. For the following reasons, the missing portion of Gagnon's personnel file is relevant, and subject to discovery.

### 1.   Action or inaction against Gagnon after Scott's discharge from UNF is relevant to bolster Scott's credibility, to meet his burden of proof in this lawsuit, and to establish damages against UNF.

It has been established that Gagnon left UNF in June 2003. Presumably, the reason for his departure is contained in the missing portion of his personnel file.

On the one hand, if Gagnon were disciplined for his treatment of Scott after Scott's employment terminated, then evidence of his punishment should exist in the missing portion of his personnel file. Evidence that Gagnon was punished for his treatment of Scott is relevant and, therefore, discoverable because it helps bolster Scott's credibility of his version of events – that he was harassed and treated unfairly because of his race. Evidence that Gagnon was punished would, therefore, aid him in meeting his burden of proof in this lawsuit and, ultimately, in establishing damages.

On the other hand, if the missing portion of Gagnon's personnel file contains no evidence of disciplinary action against Gagnon, this would support Scott's argument that UNF did nothing to rectify the hostile work environment created by one of its employees.

### 2. The time period in between Scott's dismissal and Gagnon's dismissal is relevant.

UNF claims it was unaware of the hostile work environment until shortly before Scott's termination. Therefore, any record of disciplinary action taken against Gagnon would not show up in his file <u>until after Scott's employment terminated</u>. Indeed, the timing of events in the present case makes it almost impossible for disciplinary action to show up in Gagnon's file before March 7, 2001. On Friday, March 2, 2001, Scott notified UNF's Human Resources Department that Gagnon had been harassing him and treating him unfairly because of his race. (Connecticut Commission for Human Rights Transcript (CCHR Tr.) at 61). UNF has claimed that it had scheduled a meeting for Scott's next day-off, which would have been the following Monday, March 5. (<u>Id.</u> at 86-87). UNF submits that Scott neither showed up for the meeting, nor reported to work on Tuesday, March 6 and Wednesday, March 7. (<u>Id.</u> at 88-89). As a result, UNF maintains that Scott abandoned his job because he had two consecutive unexcused absences. (<u>Id.</u> at 118-19). When examining the timing of these events – a three day period from Monday, March 5 to Wednesday, March 7 – it is clear that it was simply not feasible for UNF to receive Scott's complaint, conduct an investigation, choose the appropriate form of discipline, and then record it in Gagnon's employment file before March 7. Therefore, if UNF disciplined Gagnon, the record of that discipline would have had to occur after March 7 when Scott left the company. Therefore, the missing portion of Gagnon's file is crucial to Scott's case and should be produced.

3. **Production of Gagnon's personnel file is necessary to impeach the credibility of several key witnesses.**

UNF's two main witnesses in this case are Eichstadt and Altemus. Eichstadt has testified on one occasion that Gagnon was fired because several truck drivers complained he used foul language. (Id. at 111-13). However, this testimony is inconsistent with other testimony by Eichstadt that the use of foul language by truck drivers is commonplace in the trucking industry. (Id. at 101). Furthermore, Eichstadt later testified at her deposition that Gagnon was terminated for insubordination and for not being forthcoming in getting a medical exam so he could return to work as a driver. She never stated in her deposition that Gagnon was fired for using foul language. (Eichstadt Depos. at 27).

Meanwhile, Mr. Altemus has testified that Gagnon was fired for insubordination when he left a threatening phone message for Mr. Altemus on his business phone. (Altemus Depos. at 51). However, contrary to Eichstadt's testimony, he has never testified that Gagnon was fired for using foul language. Therefore, depending on the contents of the missing portions of the personnel file, Scott could use the information to impeach the credibility of either or both of these witnesses.

B. **Knight's File**

1. **The production of Knight's file is necessary because it may lead to information germane to Scott's disparate treatment claim.**

During Scott's employment there were only two African-American truck drivers at the Dayville, Connecticut facility – Scott and Mr. Knight – out of a total of approximately sixty truck drivers. Scott is entitled to conduct a reasonable

investigation to determine if UNF has a history of treating its African-American employees differently from its white employees – information that could help bolster Scott's claim that he received disparate treatment. Examining Knight's file is the only practical and reasonable way Scott can investigate this issue. Scott should be allowed to investigate whether Knight experienced the same type of racial harassment and unfair treatment suffered by Scott.

## CONCLUSION

For the forgoing reasons, Scott requests this honorable Court to grant this motion and compel United Natural Foods, Inc. to produce the complete personnel files of Ronald Gagnon and Jessie Knight.

Respectfully Submitted,

WILLIAM K. SCOTT
By his attorney

*[signature]*

SAMMARTINO & BERG LLP
Catherine A. Sammartino
Federal Bar No. CT 24980
128 Dorrance Street, Suite 400
Providence, RI 02903
Tel. : (401) 274-0113
Fax: (401) 274-0175

### Request for Oral Argument

Plaintiff hereby requests an oral argument on the above matters.

*[signature]*

## CERTIFICATION OF SERVICE

I hereby certify that on this 9th day of July 2004, I caused to be submitted via facsimile and regular mail a true copy of the within Memorandum of Law to the following counsel of record:

Andrew Houlding, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street, 13th Floor
Hartford, CT 06103